IN THE SUPREME COURT OF THE STATE OF DELAWARE

SHANNON WATSON, §
§
§
Defendant-Below, Appellant, §
§ No. 303, 2023
§
v. §
§
§
STATE OF DELAWARE, § Court Below: Superior Court
§ of the State of Delaware
§
Appellee. §
§ C.A. No. 2208003775 (N)

Submitted: July 10, 2024
Decided: August 13, 2024

Before **VALIHURA**, **TRAYNOR**, and **GRIFFITHS**, Justices.

Upon appeal from the Superior Court. **AFFIRMED**.

Michael W. Modica, Esquire, Wilmington, Delaware, *for Appellant*.

Andrew R. Fletcher, Esquire, Delaware Department of Justice, Wilmington, Delaware.

**VALIHURA,** Justice:

## I.    INTRODUCTION

Defendant-Below Appellant, Shannon Watson ("Watson"), appeals a jury trial verdict finding him guilty of Assault Second Degree.[1]  Watson argues that the trial court erred when it used the term "victim" when referring to the complaining witness.  Watson also contends that the trial court erred by failing to *sua sponte* issue a "character of the defendant" jury instruction.  Because neither argument was raised below, we review the issues for plain error.[2]  For the reasons set forth below, we AFFIRM Watson's conviction.

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.  Underlying Facts of the Case[3]

It is undisputed that on August 7, 2022, outside the bathroom of Catherine Rooney's Irish Pub ("Catherine Rooney's"), Watson struck Damon Howard ("Howard") at least twice in the face with a closed fist.  As a result, Howard suffered extensive and permanent head injuries.  At issue at trial was whether Watson's actions were justified as self-defense.

Howard and Watson knew each other through their respective relationships with Emily Green, who was Howard's former girlfriend.  The August 7 encounter was the culmination of tension between the two relating to allegations that Howard had physically

---

[1] App. to Opening Br. at A3, A7 (Docket, Verdict Form); App. to Answering Br. at B102 (Sentence Order).  The trial court sentenced Watson to eight years custody at supervision Level V, suspended for one year at supervision Level II.  *Id.*

[2] A plain error is "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process . . . [and is a] material defec[t] which [is] apparent on the face of the record [and is] basic, serious and fundamental[.]"  *El-Abbadi v. State*, 312 A.3d 169, 193 (Del. 2024) (alteration in original) (internal quotation marks omitted) (quoting *Williams v. State*, 796 A.2d 1281, 1284 (Del. 2002)).

[3] The following facts are derived from the record of the trial held on July 24–26, 2023.  App. to Answering Br. at B1–101 (Trial Transcript).

abused Green and their son. Howard denied all allegations of abuse. The testimony at trial described two separate non-physical encounters between Watson and Howard followed by the August 7, 2022 physical encounter. Both Howard and Watson testified at trial.

We start with the August 7 physical encounter and with Howard's trial testimony. Howard testified that he was five feet and ten inches tall and 170 pounds at the time of the encounter.[4] On that evening, during a dinner date with his partner, Holly Jordan, Howard ate a full meal and drank one or two alcoholic drinks. He and Jordan then went to Trolley Tap House ("Tap House") where they each ordered a drink. There, Jordan spotted Watson. Howard and Jordan decided to go to the Catherine Rooney's side of the building to avoid conflict with Watson.[5]

Howard saved Jordan's seat when she left to use the restroom. Jordan testified that she passed Watson and another man in the hallway.[6] When Jordan returned, Howard went to the restroom. In that hallway, Howard saw Watson and another man he did not know.[7] Howard testified that Watson said "oh, you hitting children now, or something about [his]

---

[4] *Id*. at B24 (Damon Howard Testimony [hereinafter "Howard Test. at _"] at 16:2–10).

[5] *Id*. at B14 (Howard Test. at 50:2–10). Catherine Rooney's and Tap House are two different bars attached to one another by a shared middle room. *Id*. at B13 (Howard Test. at 49:19–21). The bars are separate and have separate bathrooms. *Id*. at B23 (Howard Test. at 13:10–21).

[6] *Id*. at B43 (Holly Jordan Testimony [hereinafter "Jordan Test. at _"] at 91:1–5). Jordan testified that Watson said something to her, but she neither heard what he said nor responded. *Id*.

[7] *Id*. at B22, B23 (Howard Test. at 9:14–21, 10:13).

child[,]"[8] which startled him.[9]  Howard testified that he was becoming "really agitated" and responded by asking, "what else are you saying to me?  Like, what -- why are you doing this?  Why are you in my business?  Why are you bothering me?"[10]

Howard testified that he felt threatened because the space was "very small" and there were two people taunting him and Watson was "huge."[11]  Watson was about two or three feet from Howard at this point.  Howard stated that he did not threaten Watson and did not throw a punch at Watson that night.  On cross-examination, Howard testified that "I turned around and said 'I didn't hit my child.'  And I lunged, forward, like, I didn't hit my child."[12]

According to Howard, Watson threw the first and only punches.  Howard was hit "so many times that [Watson] had to be pulled off," and "they immediately fled."[13]  Howard believed that he was hit "[a] strong five, seven times minimum" with a closed fist.[14]  Blood was "gushing everywhere."[15]  Jordan saw Watson "fleeing" towards the exit.[16]

---

[8] *Id*. at B22 (Howard Test. at 9:22–23).  The investigating officer, Officer Jessica Gledhill, testified that Howard told her, "[t]he defendant said, 'You hit kids, you hit girls, now you're going to know how it feels,' and began to strike him numerous times in the face." *Id*. at B7 (Officer Jessica Gledhill Testimony [hereafter "Gledhill Test. at _"] at 25:6–9).

[9] *Id*. at B23 (Howard Test. at 10:1–2).

[10] *Id*. (Howard Test. at 10:6–10).

[11] *Id*. at B24 (Howard Test. at 15:5–14).

[12] *Id*. at B38 (Howard Test. at 71:15–17).

[13] *Id*. at B23 (Howard Test. at 10:18–20).

[14] *Id*. at B27 (Howard Test. at 26:8–9, 28:10–11).

[15] *Id*. at B23 (Howard Test. at 11:2).

[16] *Id*. at B43 (Jordan Test. at 92:15–19).

Jordan called the police and paramedics took Howard to the hospital in an ambulance.

At St. Francis Hospital and later at Christiana Care Oral Surgery Center, Howard was treated for a fractured jaw. Howard's medical records also contained a box that had been checked indicating "Alcohol/drug intoxication."[17] Howard's jaw was broken in three places. The surgeons put three titanium plates in his jaw where it fractured, "removed a tooth[,]" and "put something to place [his] gums up to [his] teeth."[18] He was on a liquid diet from August until November, and he continued to have complications thereafter.

According to Watson's testimony, on August 7, he weighed about 199 pounds, was six feet and one inch tall and had seventeen years of martial arts training over a thirty-year period.[19] He went to the Tap House after attending a wedding in New Jersey. He walked to the Catherine Rooney's side to get a drink because the Tap House did not have the brand of scotch that he wanted. He then saw Howard. Watson went back to his group, which included witnesses Brandon Davis ("Davis") and Darrin Christy ("Christy"), and told them "hey, you know, this guy is here. I'm just going to go home."[20] His friends said they wanted to stay and watch the band. Davis asked Christy to go with Watson to get a drink.

Watson and Christy walked back to Catherine Rooney's. Watson saw Howard open the bathroom door. Because Christy did not know Howard, Watson stated, "'[t]hat's him

---

[17] *Id*. at B40 (Howard Test. at 78:22–79:2). The State showed pictures of Howard's injuries to the jury. *Id*. at B8 (Gledhill Test. at 26:4–27:23).

[18] *Id*. at B29 (Howard Test. at 34:14–17).

[19] *Id*. at B74–75 (Shannon Watson Testimony [hereinafter "Watson Test. at _"] at 217:20–22, 218:3–10).

[20] *Id*. at B72 (Watson Test. at 209:9–11).

right there.'"[21]   Howard stated, "'you got a problem?'"[22]   Watson did not remember everything that was said, but he said, "'[y]eah, whatever, man. You're hitting kids now."[23] After Watson said that, he thought Howard was about to lunge at him. Watson testified that "[Howard] was definitely going to fight me" and that it was "[d]efinitely an attack."[24]

Watson gave the following account of what next happened: "I threw a jab, which probably was the chin shot, and I threw a hook. [Howard] went down. I looked over him, and [Christy] said, '[l]et's go.' And I said, 'I'm out of here.' I didn't even know [Howard] was hurt. I just know he went down."[25]   Watson then left the bar. From his home, and within a couple of hours of the incident, Watson called the police dispatch who connected him with the investigating officer. He said he told the officer that he had been assaulted.[26] The officer informed him that there was a warrant for his arrest. Watson turned himself in first thing in the morning.

Christy, who was with Watson at the time of the incident, testified that he met Watson at the Tap House.[27]   Christy was about five feet and ten inches tall and was

---

[21] *Id*. (Watson Test. at 209:22–23).

[22] *Id*. at B73 (Watson Test. at 210:1).

[23] *Id*. (Watson Test. at 210:12–14).

[24] *Id*. (Watson Test. at 212:2–6).

[25] *Id*. (Watson Test. at 212:8–12).

[26] At 12:51 a.m. on August 8, 2022, Officer Gledhill responded to the Tap House in reference to an assault. She obtained a statement from Howard at St. Francis Hospital. At trial, Officer Gledhill testified that Watson told her that "he was approached by [Howard] in the hallway of the bathroom. [Howard] lunged at him a few times and stated he was going to beat the f*ck out of him, and then the defendant said that due to his safety, he struck [Howard] in the face." *Id*. at B9 (Gledhill Test. at 33:15–19).

[27] *Id*. at B54 (Darrin Christy Testimony [hereinafter "Christy Test. at _"] at 137:9–22).

"skinny."[28] When Christy arrived, Davis told him to walk to the other side of the bar with Watson. When Christy and Watson were walking from the Tap House to Catherine Rooney's, they saw Howard exiting the bathroom. Watson identified Howard by stating, "like, that's him right there."[29] Howard "started walking from the bathroom towards us down the hallway, and he was, like, '[w]hat do you want to do?' And kept walking towards [Watson]."[30] According to Christy, Watson said, "I heard you like to hit kids"[31] and then Howard "made an aggressive move and lunged at him a bit"[32] with his fist up.[33] According to Christy, "[Watson] punched him twice and he fell on the ground[.]"[34] Christy then "was, like, come on" and "walked [Watson] to his car."[35] Christy denied having to pull Watson away from Howard. Christy left before the police arrived and said that he did not see Howard bleeding.[36]

---

[28] *Id*. at B75 (Watson Test. at 219:4–12).

[29] *Id*. at B55 (Christy Test. at 139:2–4).

[30] *Id*. (Christy Test. at 139:10–12).

[31] *Id*. (Christy Test. at 140:14–16).

[32] *Id*. (Christy Test. at 139:14–16, 140:17–20).

[33] *Id*. (Christy Test. at 140:19–22). On redirect-examination, Christy testified that Howard had both fists up. *Id*. at B59 (Christy Test. at 154:5–8).

[34] *Id*. at B55 (Christy Test. at 141:3–4).

[35] *Id*. (Christy Test. at 141:17–18).

[36] *Id*. at B58 (Christy Test. at 151:17–20). Davis testified that Christy told him that "[Howard] basically got up and walked away afterward." *Id*. at B60 (Brandon Davis Testimony [hereinafter "Davis Test. at _"] at 159:23–160:1).

*B. Testimony About Two Prior Altercations (Tonic and Kid Shelleen's)*

Various witnesses testified about prior altercations between Howard and Watson. Howard testified that in March of 2022,[37] he confronted Watson at another bar, Tonic, about rumors Watson was spreading about Howard's past-relationship with Emily Green. Howard denied attempting to start a physical altercation, making threats, or being highly intoxicated during the incident.[38]

Watson testified that he and his friend, Frank Johnson, had been at Tonic for about forty minutes when Howard approached. Upon Howard's approach, according to Watson, Howard stated, "'[y]o, you got a problem with me, mother f*cker'" and "'I'll F you up.'"[39] Watson testified that he responded "'[y]o, [Howard], I don't want no smoke. Leave me alone.'"[40] Then, Watson and Johnson left. Watson testified that after the incident at Tonic, he stopped going to bars in that area to avoid seeing Howard.

Johnson testified about the encounter at Tonic. He testified that Watson pointed out Howard and explained their history.[41] Johnson described the Tonic encounter as follows:

> While we ordered our drink, while we were having our first drink, I saw [Howard] approach us where we were standing. And as he approached, he was kind of – I don't know. I call it, like, acting like the alpha male. He was

---

[37] Howard testified that the encounter at Tonic occurred "post-2021" and also in "March or April of 2021." *Id.* at B15, B16 (Howard Test. at 57:20–21, 60:10–11). Defense counsel when questioning Watson, asked Watson about a March 11, 2022 incident. *Id.* at B69 (Watson Test. at 194:21–195:3). Presumably, Howard was mistaken regarding the year. In their briefs on appeal, both the State and Watson agree that the altercation occurred in "the spring and summer of 2022," Answering Br. at 3, and "[o]n March 11, 2022[,]" Opening Br. at 8.

[38] *Id.* at B17 (Howard Test. at 62:7–17).

[39] *Id.* (Watson Test. at 196:8–9, 196:12–14).

[40] *Id.* (Watson Test. at 196:10–11).

[41] *Id.* at B87 (Frank Johnson Testimony [hereinafter "Johnson Test. at _"] at 12:4–12).

8

kind of yelling loudly and pointing his finger at [Watson] and speaking very aggressively. I couldn't understand exactly what he said, you know. There was a crowd at the bar. But I could certainly see him coming towards us very aggressively and pointing at [Watson] and saying something towards him.[42]

Johnson testified that Howard was within three to five feet of them when Watson "just kind of turned to the side, and we put our drinks down and left."[43] Johnson "thought [Howard] was going to take a swing at [Watson]."[44]

About two months later,[45] there was another confrontation between Howard and Watson at Kid Shelleen's. Howard denied drinking that evening. Howard testified that he was outside smoking a cigar when Watson approached and said something like "I'm going to knock you out."[46] Howard stated he responded "whatever, whatever. Do what you got to do."[47] Later, when Howard was seated and having dinner, Watson approached. Howard testified that Watson "jump[ed] out of his chair and wave[d] his hands," saying "[h]it a man. Why don't you come hit a man."[48] Howard denied responding, threatening, or fighting Watson that night.

---

[42] *Id*. (Johnson Test. at 12:12–22).

[43] *Id*. (Johnson Test. at 13:14–16).

[44] *Id*. at B88 (Johnson Test. at 14:22–23).

[45] Howard describes this incident as "two months" after the Tonic incident. *Id*. at B17 (Howard Test. at 63:5–6, 63:9–12). Howard also stated that the August 7 incident "would be, like, maybe a couple months later." *Id*. (Howard Test. at 63:10–12). Watson stated that the Kid Shelleen's incident occurred about "maybe a month or two before" the August 7 incident. *Id*. at B71 (Watson Test. at 202:3–22).

[46] *Id*. at B17 (Howard Test. at 64:21–22). Howard testified that "I'm going to knock you out" was "one of the common things that [Watson] said to [Howard] at almost every altercation." *Id*. (Howard Test. at 65:1–3).

[47] *Id*. (Howard Test. at 65:4).

[48] *Id*. at B18 (Howard Test. at 66:8–11).

9

Watson testified that he walked past Howard and Howard started "jawing."[49] Watson testified that he said to Howard "[r]eally?  Do you want to do this here?  This is embarrassing[,]" and then Watson left.[50]

## C. *The Character Evidence*

Various witnesses testified at trial about Howard's and Watson's character.  Green, Watson's friend and Howard's ex-partner, testified that Howard had been arrested for assaulting and abusing her on December 16, 2016.[51]  She testified that Howard was intoxicated, hit and choked her, and that Howard was unpredictable and confrontational when he was drinking.  According to Green, Howard was an alcoholic.  Green stated that she told Watson about the December 16 incident.

Watson testified that he knew Howard before he met Green and that he would buy Howard drinks when Howard was a disc jockey at 8th and Union.  Watson stopped buying Howard drinks because the bartenders asked him to stop.  Watson told people to avoid Howard because of Howard's abusive behavior.  Watson testified that when Green told him about issues with her son and Howard, Watson called the Division of Family Services ("DFS").  Watson and his nephew were at Green's residence when DFS arrived and left to avoid exposing his nephew to that encounter.

Brock Gaither ("Gaither"), a high school friend of Watson's, testified that he had

---

[49] *Id*. at B71 (Watson Test. at 202:16–17).

[50] *Id*. (Watson Test. at 202:17–20).

[51] *Id*. at B46 (Emily Green Testimony at 105:18–22).

never known Watson to be violent or to start trouble at a bar.[52]   According to Gaither, Howard was "belligerent" when drunk.  He tried to avoid Howard.  At Tonic, when Howard confronted Watson, Watson was "shaken." [53]

Davis testified that he had known Watson for about five years through jujitsu classes, that he had never known Watson to be a violent person or get into a fight, and that Watson was peaceful.[54]

Mike Taylor, the bouncer at Catherine Rooney's, testified that he provided initial first aid to Howard.[55]  He thought Howard was "a little intoxicated."[56]  For the five years Watson had patronized Catherine Rooney's, there had been no issues.  He never knew Watson "to lay a hand on anybody" and that Watson was "the type of person that would de-escalate a situation."[57]

Johnson testified that he had known Watson for over twenty-three years.[58]   He described Watson as a non-violent, calm, and peaceful person.  He had never seen Watson "do anything that would be aggressive or violent in nature."[59]

---

[52] *Id*. at B50 (Brock Gaither Testimony [hereafter "Gaither Test. at _"] at 119:20–23).

[53] *Id*. (Gaither Test. at 121:5–10).  Gaither also testified that the day of the incident in this case, he and Watson were at another bar called Rocco's with two friends, not a wedding, prior to Watson going to Tap House.  *Id*. at B51 (Gaither Test. at 123:14–124:9).  At Rocco's, Gaither stated Watson had at least one drink.  *Id*. at B52 (Gaither Test. at 128:20–22).

[54] *Id*. at B59 (Davis Test. at 156:12–19, 157:1–7).

[55] *Id*. at B63 (Mike Taylor Testimony [hereinafter "Taylor Test. at _"] at 171:18 –172:5).

[56] *Id*. at B64 (Taylor Test. at 176:16).

[57] *Id*. (Taylor Test. at 174:3–8).

[58] *Id*. at B87 (Johnson Test. at 10:22–11:5).

[59] *Id*. (Johnson Test. at 11:11–13).

*D. Use of the Word "Victim"*

On appeal, Watson challenges the trial court's reference to Howard as the "victim." The issue arose during the State's cross-examination of Watson, when the following exchange occurred:

[State]: You said on direct that you tell people, your friends, to stay away from the defendant; correct?

[Watson]: I do.

[State]: Approximately how many people have you told to stay away from the defendant?

[The Court]: ***You mean the victim.***

[State]: The victim. My apologies.

[Watson]: You know, I don't have a number for you. Five, ten.[60]

The State used the word "victim" one other time:

[State]: So ultimately you would agree with me that you are spreading rumors about the victim because you have no personal knowledge of any of these incidents that you were talking about; correct?

[Watson]: Correct.[61]

Watson did not object or ask for a curative instruction. During the jury instructions, the court did instruct the jury that "[n]othing the Court has said since the trial commenced

---

[60] *Id*. at B77 (Watson Test. at 227:2–11) (emphasis added).

[61] *Id*. (Watson Test. at 228:5–9). One other witness used the word "victim." In Johnson's testimony about what occurred at Tonic, Johnson stated, "shortly after we got there, Shannon pointed out the victim in this case, I think his name is Damon, and he just explained to me, hey, that's this guy Damon." *Id*. at B87 (Johnson Test. at 12:3–6).

12

should be taken as expressing an opinion as to the outcome of this case."[62]  On appeal, Watson argues that the trial court's sole reference to Howard as the "victim" constitutes plain error.

## E. Jury Instructions

The trial court did not give a specific character evidence instruction.  Watson argues that the instruction would have made clear that character evidence, standing alone, could be sufficient to create reasonable doubt.  Neither Watson nor the State requested such an instruction.  Watson now contends on appeal that this omission constituted a second instance of plain error.

## III.    ANALYSIS

## A. The Trial Court's Reference to Howard as the "Victim" Was Not Plain Error

Watson argues that the use of the word "victim" is prejudicial where the commission of a crime is disputed because it signals to the jury that the judge believed the State's version of events.  The State responds that there was no dispute that Watson assaulted Howard, the "victim" remark did not undermine Watson's justification defense, and the remark did not suggest the trial court's opinion on the merits of the facts.

We hold that Watson failed to show that the trial court's use of the word "victim" was plain error.  Our decision in *Jackson v. State* provides useful guidance.  There, a three-member panel of our Court observed that "[i]f there is no dispute that a crime has, in fact,

---

[62] *Id*. at B97 (Jury Instructions at 53:5–7).

occurred, there is no harm in referring to the existence of a victim."[63]  In *Jackson*, the prosecutor in a rape case referred to the complaining witness as "the victim."  Because consent was his sole defense, Jackson argued that the reference to "victim" compromised the fact-finding role of the jury by assuming that the sexual acts were non-consensual.  We agreed that the word "victim" should not be used in a case where the commission of a crime is in dispute.[64]  However, we held that Jackson had not established plain error.  As we explained, "the term 'victim,' to law enforcement officers, is a term of art synonymous with 'complaining witness.'  Moreover, the term 'victim' is also used in the indictment . . . as it is routinely in criminal charges which are read to the jury."[65]  Thus, we held that, "[a]lthough the term should be avoided in the questioning of witnesses in situations where consent is an issue, its use in this case, without objection, does not constitute plain error."[66]

 In the subsequent portion of the opinion where the *en banc* panel addressed the

---

[63] *Jackson v. State*, 600 A.2d 21, 25 (Del. 1991).

[64] *Id*. at 24.

[65] *Id*. at 24–25.  *See also Stevens v. State*, 610 A.2d 727, 1992 WL 151317, at *2 (Del.  1992) (TABLE).  In *Stevens v. State*, the defendant's defense was "not that the prosecuting witness consented to sexual intercourse but that [the defendant] had no knowledge of the incident."  *Id*. Therefore, his defense was "not necessarily inconsistent with the State's claim of forcible intercourse and the implication that the subject of that assault was a 'victim.'"  *Id*.  This Court found that there was no plain error based upon the prosecutor's or defense counsel's use of the word "victim."  We reiterated our admonitions in *Jackson* that "the indiscriminate use of the term victim, although 'a practice to be avoided' may not form the bases for a claim of error, in the absence of an objection."  *Id*.  In *Mullen v. State*, we again cautioned that "the term 'victim' 'should not be used in a case where the commission of a crime is in dispute.'"  2024 WL 3421441, at *2 (Del. 2024) (TABLE) (quoting *Jackson*, 600 A.2d at 24).  In *Mullen*, we held that the prosecutor's reference to the complaining witness in a rape case as a "victim" was not reversible error where the Superior Court "cured any prejudice that may have arisen from use of the term" by issuing curative instructions after such references.  *Id*.

[66] *Jackson*, 600 A.2d at 25.

State's motion for clarification or rehearing *en banc*, the *en banc* Court clarified that:

> The opinion does not state, nor does it imply, that the use of the term 'victim' by witnesses, as a term of art or in common parlance, is a basis for objection. The Court's criticism was directed to a prosecutor's repeated use of the term in a case where consent was the sole defense, and the principal issue one of credibility, to suggest to the jury, that a crime necessarily had been committed. In this case, if the defense of consent were accepted by the jury, no crime would have been proven and the complaining witness would not be deemed a victim.[67]

We explained that where the accused's defense, if accepted, would show that no crime had been committed, "it is incompatible with the presumption of innocence for the prosecutor to refer to the complaining witness as the 'victim[.]'"[68]

Later in *Washington v. State*,[69] we rejected Washington's post-conviction relief claim of ineffectiveness of counsel where his counsel had failed to object to the use of the term "victim" by both the prosecutor and a police officer. Washington argued that because "his defense was that he was not present when Jamal Miller was threatened with a gun and robbed, any reference to Miller as the 'victim' deprived him of the presumption of innocence and relieved the State of its burden of proving its case beyond a reasonable

---

[67] *Id*. The State sought clarification based upon its concern that the Court's disapproval of the term "victim" in Jackson's trial "results in 'banning' of the use of the word 'victim.'" *Id*. Our Court found the State's position to be "an overreactive misreading of that portion of the opinion." *Id*. In *Mason v. State*, we later commented on the *Jackson* rule as applied to statements by prosecutors: "Reference to a complainant as a 'victim' is not objectionable in all cases where the commission of a crime is disputed; it is only objectionable in those cases where consent is the sole defense." 692 A.2d 413, 1997 WL 90780, at *2 (Del. 1997) (citations omitted).

[68] *Jackson*, 600 A.2d at 25; *id.* (explaining further that "[i]f there is no dispute that a crime has, in fact, occurred, there is no harm in referring to the existence of a victim," but "[i]n a narrow range of cases, such as this, such use is clearly unwarranted.").

[69] 945 A.2d 1168, 2008 WL 697591, at *1 (Del. 2008) (TABLE).

15

doubt[.]"[70]  We held that "[b]ecause commission of the crime in Washington's case was not in dispute and consent was not an issue, the use of the term 'victim' was not objectionable and Washington's attorney's failure to object on that basis did not constitute an error resulting in prejudice to Washington."[71]  We observed that although "this Court has ruled that the term 'victim' should be avoided in cases where the defendant is charged with unlawful sexual intercourse and consent is an issue, we have never issued a blanket prohibition against using the term in all criminal prosecutions."[72]

Watson relies heavily on *Fritzinger v. State*.[73]  In *Fritzinger*, the defendant faced several charges pertaining to the sexual abuse of two minors, but his defense was that the alleged criminal conduct did not occur.  In its closing argument, the State asked the jury to

---

[70] *Washington*, 2008 WL 697591, at *1.

[71] *Id*.

[72] *Id*. (citing *Jackson*, 600 A.2d at 24–25; *Mason*, 1997 WL 90780, at *2).  *See also Pierce v. State*, 966 A.2d 348, 2009 WL 189150, at *1 (Del. 2009) (TABLE).  In *Pierce*, the defendant argued that his trial counsel's failure to object to the use of the word "victim" by a police witness constituted ineffective assistance of counsel.  We found the claim lacked merit because "the impact of the objectionable terms, if any, was de minimus and not indicative of a belief on the part of the witnesses that a crime had been committed[.]"  *Id*.  *See also Green v. State*, 238 A.3d 160, 183, 184 (Del. 2020) (affirming denial of defendant's motion for postconviction relief based on counsel's failure to object after three police officers referred to the complainant as a "victim" for a total of eleven times because consent was not available as a defense due to the age of the complainant and it therefore, could not be said that the failure to make an objection was objectively unreasonable).  In *Green*, we observed that such a failure to object was not objectively unreasonable given our holding in *Mason* that such failure is only objectionable in those cases where consent is the sole defense.  In a footnote, the panel in *Green* cautioned that our holding in *Green* "should not be viewed as an affirmation of *Mason's* holding that references to a complainant as the 'victim' are only objectionable in cases where the sole defense is consent," because "[o]ther opinions, including *Jackson*, suggest that the practice is objectionable whenever the defense, as here, is that no crime was committed against the complainant."  238 A.3d at 184 n.95.  Because we found it was objectively reasonable for Green's counsel to rely on *Mason*, we did not address the tension between the two perspectives.  Nor do we address it here.

[73] 10 A.3d 603 (Del. 2010).

16

"have confidence to support two children" and the defendant objected. The trial court

sustained the objection and issued a cautionary instruction. In doing so, the court referred

to the complaining witnesses as "victims."[74] Defense counsel argued that the trial court's

reference to "victims" was reversible error. We agreed and held that:

> A judicial reference to the jury that a complaining witness is a "victim" implicitly tells the jury that the judge believes that a crime has been committed. For a judge to communicate to the jury that witnesses were victimized, in a case where the defense is that the conduct about which the complaining witness testifies never occurred, prejudices that defendant unfairly.[75]

We explained further that when a "trial judge refers to the complainants as 'victims'

in a case *where the commission of a crime itself is in dispute*, she, in effect, signals to the

jury that she accepts the State's version of the facts," and "[t]he jury may accord undue

weight to the trial judge's reference."[76] Because the *only* evidence of the alleged crimes in

*Fritzinger* was the testimony of the complaining witnesses, the defendant was able to

demonstrate prejudice to his substantial right to a fair trial.

Here, Watson's defense theory was the affirmative defense of justification by self-

defense. Justification is addressed in Section 464 of Title 11: "[t]he use of force upon or

toward another person is justifiable when the defendant reasonably believes that such force

is immediately necessary for the purpose of protecting the defendant against the use of

---

[74] *Id*. at 610. The trial court stated, "'[y]ou are not to decide this case based on the age or any other characteristics of the victims.'" *Id*. at 607.

[75] *Id*. at 610.

[76] *Id*. (emphasis added).

17

unlawful force by the other person on the present occasion."[77]  Watson would only be justified in striking Howard if Watson reasonably believed that force was immediately necessary for the purpose of protecting himself from Howard's use of unlawful force against him.

Watson admitted to punching Howard in the face, and that fact is undisputed. Watson did not deny the extent to which Howard was injured, and testified only that he was unaware of the extent of Howard's injuries.[78]  The question for the jury was whether Watson was the aggressor or whether he engaged in preemptive action to avoid an anticipated attack.  In our view, the trial court's brief reference to Howard as the "victim" did not suggest the trial court's acceptance of the State's version of the facts.  The context here differs from that in *Fritzinger*.  Here, the trial judge corrected a misstatement by the prosecutor, who while cross-examining Watson, mistakenly referred to Howard as "the defendant."[79]  The jury was later instructed that they were "the sole judges of the credibility of each witness" and that they, and only they, were the judges of the facts.[80]  We think the risk of the jury perceiving the "victim" reference to be a comment by the court on the truth, falsity, or weight of the testimony concerning Watson's justification affirmative defense is

---

[77] 11 *Del. C.* § 464 (a).

[78] 11 *Del. C.* § 612 (a)(1) ("The person recklessly or intentionally causes serious physical injury to another person[.]").

[79] The trial court should have and could have asked if the prosecutor meant "Howard," "Damon," or the "complaining witness."  Even so, we do not think that the trial court's use of the word "victim" in this context would improperly influence the jury's evaluation of Watson's justification defense.

[80] App. to Answering Br. at B97 (Jury Instructions at 50:23–51:2).

18

remote.[81]

By contrast, in *Fritzinger*, the trial judge was correcting an improper comment by the State when the court instructed the jury that they were "not to decide the case based on the age or any other characteristics of the victims."[82] Because it was a cautionary instruction to the jury about the evidence they were to consider, it was more likely to improperly influence the jury by implying that the alleged crime had in fact occurred. For these reasons, it is apparent from the record before us that the trial court's single reference to Howard as the "victim" was not a material defect that was basic, serious and fundamental in its character and that clearly deprived Watson of a substantial right or resulted in manifest injustice.

### B. There Was No Plain Error When Trial Court Failed to Sua Sponte Issue a Character Evidence Instruction

Watson next argues that the trial court erred when it did not issue, *sua sponte*, the Delaware Superior Court Pattern Jury Instruction 4.5 regarding the character of the defendant. According to Watson, the instruction would have made clear that character evidence, standing alone, could be sufficient to create a reasonable doubt, and the failure to give that instruction was plain error. Jury Instruction 4.5 regarding "character of the defendant" reads as follows:

> As a defense to the charge of [charge], the defendant has introduced evidence of [his/her] reputation or character. Under Delaware law, a defendant may

---

[81] *See State v. Carey*, 178 A. 877, 883 (Del. 1935) ("A comment or charge on the facts is some expression by the court directly or indirectly conveying to the jury the court's estimation of the truth, falsity or weight of testimony in relation to a matter at issue.").

[82] *Fritzinger*, 10 A.3d at 607.

19

introduce evidence of character traits that are relevant to the offense charged. The defendant has presented evidence of [his/her] [character trait]. If this testimony raises a reasonable doubt in your mind as to the defendant's guilt, you must give [him/her] the benefit of that doubt and find the defendant not guilty. On the other hand, if, after considering all the evidence, you find that the State has proved the defendant's guilt beyond a reasonable doubt, you must find the defendant guilty.[83]

Watson relies on *Bullock v. State*,[84] and argues that *Anderson v. State*[85] — which the State argues is dispositive — was wrongly decided and should be revisited.

Watson contends that *Bullock* supports his position that the trial court was required to give the character instruction whether or not it was requested. Bullock was charged with and convicted of manslaughter for recklessly causing the death of a motorist who had disregarded a red light.[86] In *Bullock*, a majority of our *en banc* Court determined that the jury instructions constituted plain error in two respects.

First, the majority in *Bullock* held that there was plain error in the failure of the trial court to provide the jury with a correct statement of the law in accordance with 11 *Del. C.* § 263 (addressing reckless or negligent causation). Bullock had neither objected to the causation instruction that was given nor requested an instruction based upon Section 263. But given the complex issues involving causation, "it was crucial that the jury receive a proper, clear and complete instruction on reckless causation consistent with the framework

---

[83] Opening Br. at 30–31 (quoting Superior Court's Pattern Jury Instruction 4.5).

[84] 775 A.2d 1043 (Del. 2001).

[85] 133 A.3d 202, 2016 WL 618840 (Del. 2016) (TABLE).

[86] 775 A.2d at 1044–45. Bullock was charged with manslaughter for recklessly causing the death of the other driver by driving at an excessive speed while impaired by alcohol. He faced a yellow light as he proceeded through the intersection. The other driver went through a solid red arrow.

for analysis described in [the statute]."[87] The Court explained that "[a] jury could conclude, if properly charged, that the State had not established the element of reckless causation if the collision that resulted from [the other driver] disregarding the red light was outside the risk of which [Bullock] was aware and so improbable that it would occur that it would not be expected."[88]

In holding that the failure to give an instruction based upon Section 263 constituted plain error, the Court set forth some general principles about jury instructions:

> "The primary purpose of jury instructions is to define with substantial particularity the factual issues and clearly to instruct the jury as to the principles of law [that] they are to apply in deciding the factual issues presented in the case before them." "A trial court must give instructions to a jury as required by evidence and law whether the parties request the instruction or not." Indeed, "[t]he trial judge is charged with the responsibility for instructing the jury. This is not controlled by the parties as their function and duty is to bring to the court's attention the instructions they consider applicable and the reasons why they should be given." "As a general rule, a defendant is not entitled to a particular instruction, but he does have the unqualified right to a correct statement of the substance of the law." And "[w]hile 'some inaccuracies and inaptness in statement are to be expected in any charge,' this Court will reverse if the alleged deficiency in the jury instructions 'undermined ... the jury's ability to intelligently perform

---

[87] *Id.* at 1054; *id.* at 1045 (failure to instruct the jury in accordance with Section 263 deprived Bullock "of an instruction that contained an essential principle of law necessary to decide the factual issues presented to them.").

[88] *Id.* at 1050. The Court framed the issues as follows:

> The issue here is whether, without an instruction containing the language contained in Section 263, the jury would understand that on these facts that they could conclude that the element of reckless causation required for a conviction of manslaughter 'is not established if the actual result is outside the risk of which the defendant is aware . . .' and the actual result is not too remote to have a bearing on Bullock's liability. Could they know, under the instruction as given, that Bullock could act recklessly as the State described yet not be criminally responsible for the collision and death?

*Id.* at 1049.

21

its duty in returning a verdict.'"[89]

The second instance of plain error arose from the trial court's "unavoidable accident" instruction which improperly shifted the jury's focus from causation to an examination of whether a negligently operated vehicle's collision with a recklessly operated vehicle could be unavoidable. That instruction, according to the majority, was also not supported by the facts. Even though Bullock had agreed to the instruction, the majority, nevertheless, found plain error explaining:

> Implicit in every jury instruction is the fundamental principle that the instruction applies to the specific facts in that particular case and contains an accurate statement of the law. Simply because the parties in a case agree on a particular set of instructions, does not excuse the trial judge's duty to give proper instructions. Contrary to the State's argument, an improper jury instruction may amount to plain error despite a defendant's acceptance of it.[90]

As *Bullock* states, the inquiry focuses on "the jury's ability to intelligently perform its duty in returning a verdict."[91] Relying on *Bullock*, Watson now argues that the instructions here, which omitted the Character of the Defendant charge, were incomplete, and as such, misstated the law. He acknowledges, however, that "[t]his Court rejected a

[89] *Id*. at 1047 (citing *Zimmerman v. State*, 565 A.2d 887, 890, 891 (Del. 1989); *United States v. Cooper*, 812 F.2d 1283, 1286 (10th Cir. 1987); *Flamer v. State*, 490 A.2d 104, 128 (Del. 1983)).

[90] *Id*. at 1053–54 (citing *Wainwright v. State*, 504 A.2d 1096, 1099–1100 (Del. 1986)).

[91] *Id*. at 1047. Although a majority of the Court in *Bullock* found plain error, three of the justices (one concurring and two dissenting) expressed concern regarding undue expansion of the plain error rule. *Id*. at 1054 (Veasey, C.J., concurring) ("I share the dissent's concern regarding undue expansion of the plain error rule."); *id*. at 1059 (Walsh, J., joined by Berger, J., dissenting) ("Because I believe the majority holding extends the doctrine of plain error to unacceptable limits and creates an unfortunate precedent, I respectfully dissent.").

similar argument in *Anderson*[.]"[92]

The present case is more similar to *Anderson* than *Bullock*. In *Anderson*, as in this case, the defendant was charged with Assault Second Degree.[93] Anderson admitted to punching and injuring a co-worker, but he claimed he did so only after the co-worker kneed him in the abdomen. Anderson testified that he "would never try to injure someone like that."[94] He did not ask for, and the trial court did not instruct the jury on Delaware Superior Court Pattern Jury Instruction 4.5, "Character of the Accused."[95] Anderson argued on appeal that the trial court violated his right to a fair trial when it failed to give this instruction. In rejecting that claim, this Court held that:

> Jury instructions are adequate if they allow a jury to "intelligently perform its duty in returning a verdict." Jury instructions need not be perfect. Here, the trial court judge instructed the jury to analyze the evidence set before it. This included all testimony that the jury heard. The jury was told that it could give as much weight to any piece of testimonial evidence as it deemed appropriate. This would include Anderson's assertion that he was a peaceful, non-violent person. Accordingly, the trial court did not commit plain error when it omitted an unrequested jury instruction when it charged the jury.[96]

Faced with *Anderson*'s similar facts, Watson urges us to revisit *Anderson* because it "disregards the unique feature of the character witness instruction — that it can support reasonable doubt standing alone."[97] We decline to do so. As we said in *Anderson* and

---

[92] Opening Br. at 31.

[93] *Anderson*, 2016 WL 618840, at *1.

[94] *Id*. at *2.

[95] *Id*. at *3–*4.

[96] *Id*. at *4 (citing *Whalen v. State*, 492 A.2d 552, 560 (Del. 1985)).

[97] Opening Br. at 32.

*Bullock*, a defendant is not entitled to perfect jury instructions. Rather, the instructions are adequate if they allow the jury to intelligently perform its duty.[98] Here, not providing a specific character evidence instruction did not clearly deprive the jury of a chance to intelligently perform its duty because the instructions provided sufficient guidance on the jury's fact-finding obligations.[99] The trial court instructed the jury that it was to consider all of the evidence before it, including all of the testimony, and to determine the appropriate weight to give the evidence. They were also instructed that if the evidence (including the evidence supporting Watson's justification defense) raised a reasonable doubt as to his guilt, then they were required to find him not guilty. Although additional guidance might have been helpful, we are satisfied that when considering the instructions in their entirety, any error in omitting the Character of the Defendant instruction does not rise to the level of reversible plain error.[100]

---

[98] *Anderson*, 2016 WL 618840, at *4.

[99] *See also Howell v. State*, 268 A.3d 754, 782 (Del. 2021) (reversing for erroneous cooperative witness instruction but holding that any error in an obliterated serial-number instruction was harmless because "we are satisfied that the instruction, when considered together with the instructions in their entirety, though arguably incomplete, did not jeopardize the fairness and integrity of Howell's trial.").

[100] The trial court included the following in its instructions to the jury:

- "[Y]ou, the jury, are the sole and exclusive judges of the facts of this case, of the credibility of the witnesses, and of the weight and value of their testimony."

- "You must consider all the evidence tending to support [the justification defense]. If you find the evidence raises reasonable doubt as to the defendant's guilt, you must find him not guilty of any crime to which the defense relates. And lastly, you must consider evidence of this defense along with all the other evidence in determining whether the State has satisfied its burden of proving the defendant's guilt beyond a reasonable doubt."

24

Watson cites in his reply brief a Third Circuit case, *United States v. Logan*, in which a defendant was found guilty of conspiracy under 18 U.S.C. § 1951.[101] In *Logan*, the appellant's co-conspirator testified at trial that he and the appellant had used their positions as Board of Property Assessments employees to reduce a proposed increase in the assessed value of a property in return for a payment. The only evidence tying the appellant to the crime was the testimony of the co-conspirator "on whose credibility the entire Government case hinged."[102] The appellant testified on his own behalf and offered the testimony of

---

- • "To warrant a conviction based in part on circumstantial evidence, all of the evidence, both direct and circumstantial, must lead you to conclude beyond a reasonable doubt that the defendant committed the offense charged.

    You are the sole judges of the credibility of each witness and of the weight to be given to the testimony of each. In this connection, you should not give more weight to the testimony of a police officer merely because he or she is a police officer. You should take into consideration each witnesses means of knowledge, strength of memory, and opportunity for observation, the reasonableness or unreasonableness of the testimony, the consistency or inconsistency of the testimony, the motivations of the witnesses, the fact, if it is the fact, that the testimony has been contradicted, the bias, prejudice, or interest of the witness, if any, the manner or demeanor of the witness upon the witness stand, and all other facts and circumstances shown by the evidence that affect the credibility of the testimony.

    If you find the testimony to be conflicting by reason of inconsistencies, it is your duty to reconcile it if reasonably possible so as to make one harmonious story of it all. But if you cannot do this, then it is your duty and privilege to give credit to that portion of the testimony which, in your judgment, is most worthy of credit, and disregard any portion of the testimony which, in your judgment, is unworthy of credit. In so doing, you should take into consideration the demeanor of witnesses as they testified before you, their apparent fairness in giving their testimony, their opportunites for learning and knowing facts about which they testified, and any bias or interest that they may have concerning the outcome of this case."

App. to Answering Br. at B94, B96–97 (Jury Instructions at 41:8–11, 48:1–50:3, 50:4–52:9).

[101] *United States v. Logan*, 717 F.2d 84, 85 (3d Cir. 1983).

[102] *Id*. at 87.

seven character witnesses who testified about his reputation for honesty and truthfulness.

A three-member panel of the Third Circuit held (with one member dissenting) that it was plain error not to give a "standing alone" character instruction.[103]  The Third Circuit ultimately held that "under the circumstances presented by this record, the district court committed plain error by failing to provide the jurors with any guidance or directions for the proper consideration of character evidence during their deliberations."[104]

Importantly, the Third Circuit limited its holding to cases with the following two factors:  "first, the defendant gave notice to the judge by requesting a charge on character evidence; and second, the defense case turned entirely on the defendant's credibility because the critical inculpatory evidence came from an alleged accomplice who directly contradicted the defendant's testimony."[105]  Those factors are not present here.  First, Watson did not request a jury instruction on character evidence.  The defendant in *Logan* did although it was improperly worded.[106]  The Third Circuit found that because "the defendant requested a character evidence instruction which is central to the case, a narrow

---

[103] The Court explained that "[i]n jurisdictions approving a 'standing alone' charge, the court instructs the jury that evidence of a defendant's good character alone may create a reasonable doubt whether the Government proved that the defendant had committed the crime."  *Id*. at 91 (citations omitted).

[104] *Id*. at 85.

[105] *Id.* at 92.

[106] *Id.* at 92 ("[T]he defendant alerted the district court to the issue of character evidence throughout the trial and made clear to the district court that he wished a charge on the legal effect of character evidence, even though his request was incorrectly worded.").  *But see id*. at 91 ("However, the defendant placed no exceptions [sic] to the charge on the record.  By failing to object specifically to this omission in the charge, the defendant did not preserve the issue for appeal unless the district court's action constituted plain error or affected substantial rights." (citation omitted)).

26

exception to the usual practice [not to reverse a trial court when the defendant failed to object to an erroneous charge] is justified."[107]

Second, Watson's defense did not turn entirely on Watson's or Howard's credibility. Other witnesses testified about the altercation that occurred at Catherine Rooney's on August 7, and its aftermath. There was physical evidence of the extensive injuries to Howard's head. Other evidence consisted of the description of the physical surroundings, the distance between the parties, the physical characteristics of those involved, the fact that Howard was alone and Watson was accompanied by another male, Watson's comments concerning Howard hitting children (as evidence of whether he feared Howard), Howard's lack of making physical contact with Watson, and the testimony not only of Christy (an eye witness) but of others who had observed the two interact on other occasions.

In sum, much like in *Anderson*, the jury was adequately instructed on their duty to perform their fact-finding role. There was no plain error in this case.

## IV. CONCLUSION

For the reasons set forth above, we AFFIRM Watson's conviction.

---

[107] *Id.*