# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **Case No.:** 2208003775 |
| v. | ) | |
| | ) | |
| **SHANNON WATSON,** | ) | |
| Defendant. | ) | |

Submitted: October 29, 2025
Decided: November 17, 2025

## <u>ORDER AND OPINION</u>

*Upon Consideration of Defendant's Motion for Postconviction Relief*

## DENIED

*Paige Todaro, Deputy Attorney General*, Attorney General's Office, 820 N. French Street, 7th floor, Wilmington, Delaware, *Attorney for the State.*

*Michael W. Modica*, Esquire, Michael W. Modica Attorney at Law, 22b Trolley Square, Wilmington, Delaware *Attorney for Defendant.*

**Jones, J.**

On January 25, 2025, Shannon Watson ("Watson") filed the instant Motion for Postconviction Relief pursuant to Superior court Criminal Rule 61 ("Rule 61 Motion").[1] Trial Counsel filed an Affidavit in Response to Watson's Motion on July 2, 2025.[2] The State filed its Response on September 16, 2025.

## I.     BACKGROUND AND PROCEDURAL HISTORY

Watson's conviction and the instant Postconviction Motion stem from a physical altercation occurring between Watson and an acquaintance, Damon Howard, at Catherine Rooney's Irish Pub on August 7, 2022.[3] Based on this incident, a jury found Watson guilty of Assault Second Degree.[4] Watson filed a timely direct appeal seeking reversal from the Delaware Supreme Court on two issues: (1) the trial court erred in using the word "victim" to refer to the complaining witness, and (2) the trial court erred by failing to *sua sponte* give a "character of the defendant" jury instruction.[5] The Court defers to the opinion on Watson's appeal for its well-stated recitation of the pertinent facts:

**Underlying Facts of the Case**

It is undisputed that on August 7, 2022, outside the bathroom of Catherine Rooney's Irish Pub ("Catherine Rooney's"), Watson struck Damon Howard ("Howard") at least twice in the face with a closed fist. As a result, Howard suffered extensive and permanent head injuries. At

---

[1] Docket Item ("D.I.") 32.
[2] D.I. 38.
[3] D.I. 32 p. 5.
[4] *Id.* p.4.
[5] *Watson v. State*, 326 A.3d 654, 655 (Del. 2023).

issue at trial was whether Watson's actions were justified as self-defense.

Howard and Watson knew each other through their respective relationships with Emily Green, who was Howard's former girlfriend. The August 7 encounter was the culmination of tension between the two relating to allegations that Howard had physically abused Green and their son. Howard denied all allegations of abuse. The testimony at trial described two separate non-physical encounters between Watson and Howard followed by the August 7, 2022 physical encounter. Both Howard and Watson testified at trial.

We start with the August 7 physical encounter and with Howard's trial testimony. Howard testified that he was five feet and ten inches tall and 170 pounds at the time of the encounter. On that evening, during a dinner date with his partner, Holly Jordan, Howard ate a full meal and drank one or two alcoholic drinks. He and Jordan then went to Trolley Tap House ("Tap House") where they each ordered a drink. There, Jordan spotted Watson. Howard and Jordan decided to go to the Catherine Rooney's side of the building to avoid conflict with Watson.

Howard saved Jordan's seat when she left to use the restroom. Jordan testified that she passed Watson and another man in the hallway. When Jordan returned, Howard went to the restroom. In that hallway, Howard saw Watson and another man he did not know. Howard testified that Watson said "oh, you hitting children now, or something about [his] child[,]"[8] which startled him. Howard testified that he was becoming "really agitated" and responded by asking, "what else are you saying to me? Like, what -- why are you doing this? Why are you in my business? Why are you bothering me?"

Howard testified that he felt threatened because the space was "very small" and there were two people taunting him and Watson was "huge." Watson was about two or three feet from Howard at this point. Howard stated that he did not threaten Watson and did not throw a punch at Watson that night. On cross-examination, Howard testified that "I turned around and said 'I didn't hit my child.' And I lunged, forward, like, I didn't hit my child."

3

According to Howard, Watson threw the first and only punches. Howard was hit "so many times that [Watson] had to be pulled off," and "they immediately fled." Howard believed that he was hit "[a] strong five, seven times minimum" with a closed fist. Blood was "gushing everywhere." Jordan saw Watson "fleeing" towards the exit. Jordan called the police and paramedics took Howard to the hospital in an ambulance.

At St. Francis Hospital and later at Christiana Care Oral Surgery Center, Howard was treated for a fractured jaw. Howard's medical records also contained a box that had been checked indicating "Alcohol/drug intoxication." Howard's jaw was broken in three places. The surgeons put three titanium plates in his jaw where it fractured, "removed a tooth[,]" and "put something to place [his] gums up to [his] teeth." He was on a liquid diet from August until November, and he continued to have complications thereafter.

According to Watson's testimony, on August 7, he weighed about 199 pounds, was six feet and one inch tall and had seventeen years of martial arts training over a thirty-year period. He went to the Tap House after attending a wedding in New Jersey. He walked to the Catherine Rooney's side to get a drink because the Tap House did not have the brand of scotch that he wanted. He then saw Howard. Watson went back to his group, which included witnesses Brandon Davis ("Davis") and Darrin Christy ("Christy"), and told them "hey, you know, this guy is here. I'm just going to go home." His friends said they wanted to stay and watch the band. Davis asked Christy to go with Watson to get a drink.

Watson and Christy walked back to Catherine Rooney's. Watson saw Howard open the bathroom door. Because Christy did not know Howard, Watson stated, " '[t]hat's him right there.' " Howard stated, " 'you got a problem?' " Watson did not remember everything that was said, but he said, " '[y]eah, whatever, man. You're hitting kids now." After Watson said that, he thought Howard was about to lunge at him. Watson testified that "[Howard] was definitely going to fight me" and that it was "[d]efinitely an attack."

Watson gave the following account of what next happened: "I threw a jab, which probably was the chin shot, and I threw a hook. [Howard]

went down. I looked over him, and [Christy] said, '[l]et's go.' And I said, 'I'm out of here.' I didn't even know [Howard] was hurt. I just know he went down." Watson then left the bar. From his home, and within a couple of hours of the incident, Watson called the police dispatch who connected him with the investigating officer. He said he told the officer that he had been assaulted. The officer informed him that there was a warrant for his arrest. Watson turned himself in first thing in the morning.

Christy, who was with Watson at the time of the incident, testified that he met Watson at the Tap House. Christy was about five feet and ten inches tall and was "skinny." When Christy arrived, Davis told him to walk to the other side of the bar with Watson. When Christy and Watson were walking from the Tap House to Catherine Rooney's, they saw Howard exiting the bathroom. Watson identified Howard by stating, "like, that's him right there." Howard "started walking from the bathroom towards us down the hallway, and he was, like, '[w]hat do you want to do?' And kept walking towards [Watson]." According to Christy, Watson said, "I heard you like to hit kids" and then Howard "made an aggressive move and lunged at him a bit" with his fist up. According to Christy, "[Watson] punched him twice and he fell on the ground[.]"Christy then "was, like, come on" and "walked [Watson] to his car." Christy denied having to pull Watson away from Howard. Christy left before the police arrived and said that he did not see Howard bleeding.

### Testimony About Two Prior Altercations (Tonic and Kid Shelleen's)

Various witnesses testified about prior altercations between Howard and Watson. Howard testified that in March of 2022, he confronted Watson at another bar, Tonic, about rumors Watson was spreading about Howard's past-relationship with Emily Green. Howard denied attempting to start a physical altercation, making threats, or being highly intoxicated during the incident.

Watson testified that he and his friend, Frank Johnson, had been at Tonic for about forty minutes when Howard approached. Upon Howard's approach, according to Watson, Howard stated, " '[y]o, you got a problem with me, mother f*cker' " and " 'I'll F you up.' " Watson

testified that he responded " '[y]o, [Howard], I don't want no smoke. Leave me alone.' " Then, Watson and Johnson left. Watson testified that after the incident at Tonic, he stopped going to bars in that area to avoid seeing Howard.

Johnson testified about the encounter at Tonic. He testified that Watson pointed out Howard and explained their history. Johnson described the Tonic encounter as follows:

While we ordered our drink, while we were having our first drink, I saw [Howard] approach us where we were standing. And as he approached, he was kind of – I don't know. I call it, like, acting like the alpha male. He was kind of yelling loudly and pointing his finger at [Watson] and speaking very aggressively. I couldn't understand exactly what he said, you know. There was a crowd at the bar. But I could certainly see him coming towards us very aggressively and pointing at [Watson] and saying something towards him.

Johnson testified that Howard was within three to five feet of them when Watson "just kind of turned to the side, and we put our drinks down and left." Johnson "thought [Howard] was going to take a swing at [Watson]."

About two months later, there was another confrontation between Howard and Watson at Kid Shelleen's. Howard denied drinking that evening. Howard testified that he was outside smoking a cigar when Watson approached and said something like "I'm going to knock you out." Howard stated he responded "whatever, whatever. Do what you got to do." Later, when Howard was seated and having dinner, Watson approached. Howard testified that Watson "jump[ed] out of his chair and wave[ed] his hands," saying "[h]it a man. Why don't you come hit a man." Howard denied responding, threatening, or fighting Watson that night.

Watson testified that he walked past Howard and Howard started "jawing." Watson testified that he said to Howard "[r]eally? Do you want to do this here? This is embarrassing[,]" and then Watson left.

## The Character Evidence

Various witnesses testified at trial about Howard's and Watson's character. Green, Watson's friend and Howard's ex-partner, testified that Howard had been arrested for assaulting and abusing her on December 16, 2016. She testified that Howard was intoxicated, hit and choked her, and that Howard was unpredictable and confrontational when he was drinking. According to Green, Howard was an alcoholic. Green stated that she told Watson about the December 16 incident.

Watson testified that he knew Howard before he met Green and that he would buy Howard drinks when Howard was a disc jockey at 8th and Union. Watson stopped buying Howard drinks because the bartenders asked him to stop. Watson told people to avoid Howard because of Howard's abusive behavior. Watson testified that when Green told him about issues with her son and Howard, Watson called the Division of Family Services ("DFS"). Watson and his nephew were at Green's residence when DFS arrived and left to avoid exposing his nephew to that encounter.

Brock Gaither ("Gaither"), a high school friend of Watson's, testified that he had never known Watson to be violent or to start trouble at a bar. According to Gaither, Howard was "belligerent" when drunk. He tried to avoid Howard. At Tonic, when Howard confronted Watson, Watson was "shaken."

Davis testified that he had known Watson for about five years through jujitsu classes, that he had never known Watson to be a violent person or get into a fight, and that Watson was peaceful.

Mike Taylor, the bouncer at Catherine Rooney's, testified that he provided initial first aid to Howard. He thought Howard was "a little intoxicated." For the five years Watson had patronized Catherine Rooney's, there had been no issues. He never knew Watson "to lay a hand on anybody" and that Watson was "the type of person that would de-escalate a situation."

Johnson testified that he had known Watson for over twenty-three years. He described Watson as a non-violent, calm, and peaceful

7

person. He had never seen Watson "do anything that would be aggressive or violent in nature."

## Use of the Word "Victim"

On appeal, Watson challenges the trial court's reference to Howard as the "victim." The issue arose during the State's cross-examination of Watson, when the following exchange occurred:

[State]: You said on direct that you tell people, your friends, to stay away from the defendant; correct?

[Watson]: I do.

[State]: Approximately how many people have you told to stay away from the defendant?

[The Court]: *You mean the victim*.

[State]: The victim. My apologies.

[Watson]: You know, I don't have a number for you. Five, ten.

The State used the word "victim" one other time:

[State]: So ultimately you would agree with me that you are spreading rumors about the victim because you have no personal knowledge of any of these incidents that you were talking about; correct?

[Watson]: Correct.

Watson did not object or ask for a curative instruction. During the jury instructions, the court did instruct the jury that "[n]othing the Court has said since the trial commenced should be taken as expressing an opinion as to the outcome of this case." On appeal, Watson argues that the trial court's sole reference to Howard as the "victim" constitutes plain error.

## Jury Instructions

The trial court did not give a specific character evidence instruction. Watson argues that the instruction would have made clear that character evidence, standing alone, could be sufficient to create reasonable doubt. Neither Watson nor the State requested such an instruction. Watson

now contends on appeal that this omission constituted a second instance of plain error.[6]

Applying a plain error review, the Court held that neither issue raised on appeal warranted reversal and, thus, affirmed Watson's conviction.[7]

## II.   PROCEDURAL BARS UNDER RULE 61(i)

Before the substantive arguments of a Rule 61 Motion can be addressed, the Court must first ensure the Motion passes all procedural bars.[8]  The Court does not need to consider the merits of claims that do not surpass all procedural bars.[9]  Watson has timely filed his first Rule 61 Motion.[10]  Ineffective assistance of counsel claims generally are not procedurally barred if they were not asserted in proceedings leading to conviction.[11]   However, if petitioner cannot sufficiently show counsel's performance amounted to ineffective assistance of counsel, then there is no cause for relief from the procedural bar.[12]  When that is the case, petitioner cannot surpass this procedural bar solely on the basis that these claims could not be brought in prior proceedings.[13]  Watson's claims have not been formerly adjudicated.[14]  Despite the

---

[6] *Watson*, 326 A.3d at 655-61 (citations omitted).
[7] *Id.* at 669.
[8]  *State v. Appiah*, 2023 WL 5608927 (Del. Super. Ct. Aug. 28, 2023) (citing *Younger v. State*, 580 A.2d 552, 554 (Del. 1990)).
[9] *Younger*, 580 A.2d at 552.
[10] Super. Ct. Crim. R. 61(i)(1)-(2).
[11] *Green v. State*, 238 A.3d 160, 175 (Del. 2020); *State v. Bartell*, 2023 WL 7905368 (Del. Super Ct. Nov. 16, 2023); *see McGriff v. State*, 2024 WL 3770733, at *2 (Del. August 12, 2024) ("[t]he procedural bars of Rule 61 do not bar a timely claim of ineffective assistance of counsel."); *see* Super. Ct. Crim. R. 61(i)(3).
[12] *Shelton v. State*, 744 A.2d 465, 475 (Del. 2000).
[13] *Id.*
[14] *See* Super. Ct. Crim. R. 61(i)(4).

issues brought on appeal being identical to the issues raised in this Motion, the Court analyzes the issues raised with a different standard.[15] Finally, neither exception applies because the Rule 61 Motion does not argue lack of jurisdictional claims nor is it a subsequent motion.[16]

Watson acknowledges that he has completed his probation sentence.[17] Yet, he asserts that he should be afforded postconviction relief due to collateral consequences of his felony conviction.[18] Watson represents to the Court that his felony conviction impacts his global role at work because he is prohibited from entering certain countries – specifically Canada and Germany.[19] Under the collateral consequences doctrine, the postconviction motion of a defendant no longer in custody is not necessarily moot so long as the defendant can show a specific collateral consequence stemming from their conviction.[20] The Court is satisfied that Watson has adequately shown a collateral consequence of his conviction to render this Motion justiciable.

---

[15] *See Green v. State*, 238 A.3d 160, 177 (Del. 2020) (holding the different standards avoid Rule 61(i)(4)'s formerly adjudicated bar).
[16] *See* Super. Ct. Crim. R. 61(i)(5).
[17] D.I. 32 p.18.
[18] *Id. Martin v. State*, 306 A.3d 50 (Del. 2023)
[19] *Id. See* A1; A33-57.
[20] *Martin v. State*, 306 A.3d 50 (Del. 2023) (citing *Carafas v. LaVallee*, 391 U.S. 234 (1968); *Gural v. State*, 251 A.2d 344 (Del. 1969)).

## III. *STRICKLAND* STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL

In *Strickland v. Washington*, the United States Supreme Court established the standard for an ineffective assistance of counsel claim brought by a criminal defendant.[21] The standard is a two-prong test requiring both prongs be met before a judgment is set aside.[22] The *Strickland* Court emphasizes the importance of the reviewing court's responsibility to make an ineffective assistance determination without "the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."[23]

The first prong, or the performance prong, asks whether counsel's representation was deficient in failing to meet an objective standard of reasonableness.[24] This is a stringent burden for the movant to overcome because there is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."[25] The objective standard utilized in this prong considers "prevailing professional norms" in determining the reasonableness of counsel's actions.[26]

---

[21] 466 U.S. 668, 687 (1984).
[22] *Id.* at 689.
[23] *Id.*
[24] *Id.*
[25] *Id.* at 689.
[26] *Neal v. State*, 80 A.3d 935, 941 (citing *Strickland*, 466 U.S. at 689).

11

The second prong, or the prejudice prong, determines whether deficiencies in counsel's representation caused the defendant substantial prejudice.[27] Under this prong, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[28] The potential of a different outcome "must be substantial, not just conceivable."[29] A reasonable probability is a probability "sufficient to undermine confidence in the outcome" of the proceeding.[30]

The movant must prove both prongs – deficient attorney performance and resulting prejudice – to make a proper ineffective assistance of counsel claim.[31] Therefore, "failure in the first instance to prove either will doom [the movant's] claim, and the Court need not address the other."[32]

## IV.   ANALYSIS

As stated above, the Delaware Supreme Court heard and ruled on identical issues to those raised in the instant Motion.[33] However, Watson contends both ineffective assistance of counsel issues at hand differ from the issues raised on direct appeal.[34] Watson argues the issues on appeal were analyzing trial court errors under

---

[27] *Strickland*, 466 U.S. at 687.
[28] *Id.* at 694.
[29] *Neal*, 80 A.3d at 942 (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011)).
[30] *Id.*
[31] *State v. Thomas*, 2024 WL 5117117, at *6 (Del. Super. Dec. 16, 2024).
[32] *Id.* at *7 (citing *Strickland*, 466 U.S. at 697; *Ploof v. State*, 75 A.3d 811, 825 (Del. 2013) ("*Strickland* is a two-pronged test, and there is no need to examine whether an attorney performed deficiently if the deficiency did not prejudice the defendant.")).
[33] *See Watson*, 326 A.3d 654.
[34] D.I. 32 p.26-27; 39-40.

12

a plain error standard, but the Trial Counsel's alleged failures raised in the Rule 61 Motion impacted Watson's due process rights and prevented him from having a more favorable appellate review under an "abuse of discretion" standard.[35] An abuse of discretion occurs "when a court has exceeded the bounds of reason in light of the circumstances or so ignored recognized rule of law or practice so as to produce injustice."[36] This is a more favorable standard to Watson than the "plain error" standard that was applied on direct appeal.[37]

When looking to the opinion from the direct appeal, it appears to this Court that an abuse of discretion standard would not have changed the outcome of the direct appeal. The Court will go through both ineffective assistance claims below.

A. Claim I: Trial Counsel was Ineffective for Failing to Object to the Court and State's Use of the Word "Victim" When Referencing to the Complaining Witness

During trial, use of the word "victim" to identify Damon Howard occurred twice – once by the Court and once by the State.[38] Watson contends the references to Howard as a "victim," especially by the Court, gives jurors the idea that Watson committed a crime despite that being a disputed issue due to Watson's justification

---

[35] *Id.*

[36] *McNair v. State*, 990 A.2d 398, 401 (Del. 2010).

[37] A "plain error" is "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process…[and is a] material defec[t] which [is] apparent on the face of the record [and is] basic, serious and fundamental[.]" *El-Abbadi v. State*, 312 A.3d 169, 193 (Del. 2024).

[38] *Watson*, 326 A.3d at 661.

defense.[39]  Trial Counsel denies this claim because the exchange in which the Trial Judge referred to Howard as a "victim" was a correction and not prejudicial.[40]

As noted in the appellate opinion, use of the term "victim" in a case where there is a dispute as to whether a crime was committed relays to the jury that the Court "in effect…accepts the State's versions of the facts."[41]  Yet, the Supreme Court has never "issued a blanket prohibition against using the term [victim] in all criminal prosecutions."[42]  On direct appeal, the Supreme Court held "the trial court's brief reference to Howard as the 'victim' did not suggest the trial court's acceptance of the State's version of the facts."[43]  The fact that Watson punched Howard in the face was not in dispute; rather, Watson contended he was using self-defense.[44]  Thus, the question before the jury was "whether Watson was the aggressor or whether he engaged in preemptive action to avoid an anticipated attack."[45]

Further, the Supreme Court distinguished *Fritzinger v. State* by differentiating the circumstances in which "victim" was used.[46]  In *Fritzinger*, the trial judge referred to the complaining witness as the "victim" during a cautionary jury instruction on what evidence to consider – a time when jurors are more likely to be

---

[39] D.I. 32 p.34.
[40] D.I. 38.
[41] *Watson*, 326 A.3d at 664 (quoting *Fritzinger v. State*, 10 A.3d 603, 610 (Del. 2010)).
[42] *Id.* at 663 (quoting *Washington v. State*, 2008 WL 697591, at *1 (Del. 2008)).
[43] *Id.* at 664.
[44] *Id.*
[45] *Id.*
[46] *Id.* at 664-65.

14

improperly influenced.[47]   Whereas in Watson's case, the Trial Judge used the term to correct the prosecutor's reference to Howard as the "defendant" during Watson's cross-examination.[48]   Further, in *Fritzinger*, the two witnesses the Court referred to as "victims" provided the sole evidence alleging that the crime occurred – making the trial judge's use of the term even more prejudicial in that case.[49]

Considering the Court's logic in the direct appeal opinion, it appears that the Delaware Supreme Court overruling trial counsel's objection to the use of the term "victim" in the circumstance of this case would survive an abuse of discretion standard.  As discussed above, the Court evaluated the issue under existing relevant case law and determined that the cursory use of the term "victim" did not suggest to the jury that the trial court was accepting the State's version of the facts and that any risk of jurors "perceiving the 'victim' reference to be a comment by the court on the truth, falsity, or weight of the testimony concerning Watson's justification affirmative defense is remote."[50]   With this finding in mind, this Court concludes that the Delaware Supreme Court would not find that the trial court exceeded the bounds of reason in light of the circumstances nor ignored recognized law or practice so as to produce injustice by overruling an objection to the trial court's use of the term "victim" as a fleeting, corrective measure.

---

[47] *Id.*
[48] *Id.* at 661.
[49] *Fritzinger*, 10 A.3d at 610.
[50] *Watson*, 326 A.3d at 664.

Jurors were given the usual instruction that "[n]othing the Court has said since the trial commenced should be taken as expressing an opinion as to the outcome of the case."[51] They were also instructed that they were "the sole judges of the credibility of each witness" and the only "judges of the facts."[52] Watson argues that it cannot be assumed that the jury understood these instructions to mean the trial judge intended to correct the misstatement.[53] However, "it is presumed that the jury follows the instruction of the trial court."[54] Therefore, Watson and the Court have to trust that the jury considered the instructions in light of the entire trial – including when the trial judge referred to Howard as the "victim."

For these reasons, the Court does not find that, if Trial Counsel had objected to use of the word "victim," the outcome of Watson's trial would have been different. Nor does the Court find that Trial Counsel's failure to object undermined confidence in the outcome of Watson's trial. Because the Court finds Watson's claim does not surpass the prejudice prong, the Court does not need to determine whether Trial Counsel's failure amounts to a deficient performance.

---

[51] *Watson*, 326 A.3d at 661.
[52] *Id.* at 661.
[53] D.I. 32 p.35.
[54] *Rodriguez v. State*, 109 A.3d 1075, 1080 (Del. 2015).

B. Claim II: Trial Counsel was Ineffective for Failing to Ask the Court to Give a "Character of Defendant" Jury Instruction

Watson contends that, if Trial Counsel had requested a "character of the defendant" instruction, then the Trial Judge would have granted it or the issue would have been preserved for appeal under an abuse of discretion standard.[55] Watson argues the jurors were given an incomplete statement of the law such that the jury could not "intelligently perform its duty in returning a verdict."[56] The following is the language of the "character of the defendant" pattern jury instruction:

> As a defense to the charge of [charge], the defendant has introduced evidence of [his/her] reputation or character. Under Delaware law, a defendant may introduce evidence of character traits that are relevant to the offense charged. The defendant has presented evidence of [his/her] [character trait]. If this testimony raises a reasonable doubt in your mind as to the defendant's guilt, you must give [him/her] the benefit of that doubt and find the defendant not guilty. On the other hand, if, after considering all the evidence, you find that the State has proved the defendant's guilt beyond a reasonable doubt, you must find the defendant guilty.[57]

Trial Counsel admits that he did not request this instruction but contends that Watson's trial was not impacted by the lack of this instruction.[58] Trial Counsel points out that the jurors received instructions on "credibility of witnesses," "direct and circumstantial evidence," "justification – use of force in self-protection," and "conflicts in testimony."[59] Further, Trial Counsel states his strategy in Watson's

---

[55] D.I. 32 p.46.
[56] *Id.* at 47 (quoting *Whalen v. State*, 492 A.2d 552, 560 (Del. 1985)).
[57] Delaware Superior Court's Criminal Pattern Jury Instruction 4.5.
[58] D.I. 38.
[59] *Id.*

17

case was to elicit testimony supporting Watson's self-defense argument not to dispute Watson punching Howard.[60]

The opinion from Watson's direct appeal applies *Anderson v. State*[61] to hold that "any error in omitting the Character of the Defendant instruction does not rise to the level of reversible plain error."[62] The *Anderson* Court was presented with facts similar to the instant case and found that the jury had sufficient instruction from the trial judge to perform its duty without a "character of the defendant" instruction.[63] The Delaware Supreme Court distinguished *Bullock v. State* on the basis that in *Bullock* the missing jury instruction was "crucial" for the jury to intelligently perform their duty in returning a verdict.[64]

A trial judge has discretion over whether to give a particular jury instruction; therefore, the decision will not be reversed unless the higher court finds the trial judge abused this discretion.[65] "[A] defendant is not entitled to perfect jury instructions. Rather, the instructions are adequate if they allow the jury to intelligently perform its duty."[66]

Watson's main contention is that, without the "character of the defendant" instruction, the jurors did now know that they could find reasonable doubt from only

---

[60] *Id.*
[61] 133 A.3d 202, 2016 WL 618840 (Del. 2016) (Table).
[62] *Watson*, 326 A.3d at 668.
[63] *Anderson*, 2016 WL 618840, at *1, 4.
[64] *Watson*, 326 A.3d at 665 (citing *Bullock v. State*, 775 A.2d 1043, 1054 (Del. 2001)).
[65] *Miller v. State*, 893 A.3d 937, 949 (Del. 2006).
[66] *Watson*, 326 A.3d at 667 (citing *Anderson*, 2016 WL 618840, at*4).

18

the character evidence.[67] However, the jurors' role in evaluating all evidence before them through the lens of the reasonable doubt burden was apparent from the instructions they were given. The trial judge gave the following instructions to the jury:

> [Y]ou, the jury, are the sole and exclusive judges of the facts of this case, of the credibility of the witnesses, and of the weight and value of their testimony.
>
> You must consider all the evidence tending to support [the justification defense]. If you find the evidence raises reasonable doubt as to the defendant's guilt, you must find him not guilty of any crime to which the defense relates. And lastly, you must consider evidence of this defense along with the other evidence in determining whether the State has satisfied its burden of proving the defendant's guilt beyond a reasonable doubt.
>
> To warrant a conviction based in part on circumstantial evidence, all of the evidence, both direct and circumstantial, must lead you to conclude beyond a reasonable doubt that the defendant committed the offense charged.
>
> You are the sole judges of the credibility of each witness and of the weight to be given to the testimony of each. In this connection, you should not give more weight to the testimony of a police officer merely because he or she is a police officer. You should take into consideration each witnesses means of knowledge, strength of memory, and opportunity for observation, the reasonableness or unreasonableness of the testimony, the consistency or inconsistency of the testimony, the motivations of the witnesses, the fact, if it is the fact, that the testimony has been contradicted, the bias, prejudice, or interest of the witness, if any, the manner or demeanor of the witness upon the witness stand, and all other facts and circumstance shown by the evidence that affect the credibility of the testimony.

---

[67] D.I. 32 p.47.

19

> If you find the testimony to be conflicting by reason of inconsistencies, it is your duty to reconcile it if reasonably possible so as to make one harmonious story of it all. But if you cannot do this, then it is your duty and privilege to give credit to that portion of the testimony which, in your judgment, is most worthy of credit, and disregard any portion of the testimony which, in your judgment, is unworthy of credit. In so doing, you should take into consideration the demeanor of witnesses as they testified before you, their apparent fairness in giving their testimony, their opportunities for learning and knowing facts about which they testified, and any bias or interest that they may have concerning the outcome of the case.[68]

Additionally, evidence put before the jurors included character witness testimony, eyewitness testimony, and physical evidence of Howard's injuries.[69] Jurors were not relying solely on evidence of Watson and Howard's credibility.

The jurors were provided with the proper instructions so that they could intelligently perform their duty. The Court does not find that the trial judge would be found by the Delaware Supreme Court to have abused discretion by not allowing a "character of the defendant" instruction nor would the instruction necessarily change the minds of the jurors considering the instructions they were given and the ample evidence before them. It does not appear that Trial Counsel's failure to ask for a "character of the defendant" instruction undermines the confidence of the trial's outcome. Because the Court finds that Watson was not prejudiced, it does not need to evaluate Trial Counsel for deficiencies on this issue.

---

[68] *Watson*, 326 A.2d at 668 n.100.
[69] *Id.* at 655-60, 669.

20

For the above reasons, the Court **DENIES** Watson's Rule 61 Motion.

**IT IS SO ORDERED.**

*/s/ Francis J. Jones, Jr.*
Francis J. Jones, Jr., Judge

cc:    File&ServeXpress
       Shannon Watson,